**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1269-22

JOSEPH RONNE, a minor, by his
parent and natural guardian DAINA
RONNE and DAINA RONNE,
individually,

      Plaintiffs-Appellants,

v.

BOROUGH OF DUMONT,
DUMONT BOARD OF
EDUCATION, MARC FERRARA,
MAXABILITY SPORTS AND
CROSSFIT, and CROSSFIT, INC.,

      Defendants-Respondents.

---

Argued May 8, 2024 – Decided July 15, 2024

Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-4907-17.

Joseph M. Cerra argued the cause for appellants (Lynch Law Firm, PC, attorneys; Arthur V. Lynch and Joseph M. Cerra, on the briefs).

Richard J. Williams, Jr. argued the cause for respondent Dumont Board of Education (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Richard J. Williams, Jr., of counsel and on the brief).

PER CURIAM

Plaintiffs Joseph Ronne, by his parent Daina Ronne, and Daina[1] individually, appeal from the September 30, 2022 judgment in favor of defendant following a jury verdict in which the jury found Joseph sixty percent negligent for his injuries incurred during an after-school workout. Plaintiffs also appeal the December 22, 2022 order denying their motion to alter or amend the judgment, or alternatively, for a new trial. We affirm.

## I.

## A.

The trial took place in September 2022. Joseph had graduated high school, was attending college, and working in a surveying office.

At the time Joseph was injured, he was in his first year of high school and determined to play baseball. Joseph testified that he believed in eighth grade he "was at the top of the pack" as a hitter, fielding was his "strong suit," and he was one of the fastest runners. He had played on numerous travel and recreational

---

[1] As plaintiffs share a surname, we use first names for the ease of the reader.

teams.  Joseph stated he wanted to play baseball in high school and was striving to make the varsity team.

To prepare for the baseball season, Joseph began working out at a gym during the summer before starting high school and continued after school began in September 2015.  He said he went to the gym five times a week in the mornings before school, and sometimes he went back again to work out after school.

Joseph stated he usually worked out with heavy weights at the gym and completed three to five "reps" or rounds of exercises with a lot of rest in between.  He explained he did "bench press[es], squats, leg extension[s], leg curls, tricep extensions, bicep curls, [and] overhead press[es]."  He bench pressed 225 pounds and squatted with 285 pounds.  He did not do any cardio specific exercises.

Joseph testified he received a group text message from other students on February 17, 2016, informing him of a workout in the high school weight room. He believed the workout was important to making the baseball team.  He knew Marc Ferrara, the assistant junior varsity (JV) baseball coach, would be overseeing the workout.  Ferrara had been Joseph's sixth grade math teacher.

3

Joseph said there were approximately twenty students at the workout, and they began with a stretching warmup led by one of the baseball players. Ferrara then explained the workout, which consisted of four rounds of three one-minute exercises—kettlebell swings, squats with a weight, and burpees (a cardio exercise)—during which they would try to complete as many repetitions as possible followed by one minute of rest. The students worked in pairs. One partner completed the exercise while the other partner kept time.

Joseph stated he had not done a workout formatted this way before. He said the students were told to use a dumbbell that they "felt comfortable with" so he chose a forty-pound dumbbell.[2] Joseph stated he believed he was stronger than most of the other students and he wanted to impress the coaches. He never considered slowing down or stopping because he was not "there to stop or quit." He conceded he knew he could stop if he wanted to.

Joseph said after he finished the workout, he felt "[h]orrible, the wors[t] [he'd] ever felt in [his] life." He was "extremely" sore, "like nothing else [he] had ever felt before." He testified it was the most intense workout he had ever experienced, and he was having trouble breathing. After the Wednesday

---

[2] The emergency department notes reflected Joseph's statement that he used a thirty-pound dumbbell to do the exercises.

A-1269-22

workout, according to Joseph, Ferrara said the students should tell anyone who wanted to try out for the baseball team to attend the next workout to be held on Friday.

That night, Joseph felt very sore and went straight to bed when he got home. He said the following day he "felt like a piece of wood," could not bend, had a pain in his abdomen, and "could not focus on anything other than the pain that was in [his] back." He went to school and when he got home, he tried to alleviate the pain by lying on his stomach on the couch, icing, using a heating pad, and taking over-the-counter pain medication.

On Friday, Joseph explained he felt even worse but went to school so he could go to the workout. He completed the workout which was two laps around the track. Afterwards, he went to the bathroom because he felt like he had to vomit. He said Ferrara saw him and told him he looked horrible. Joseph called his mother to pick him up.

Joseph testified his pediatrician prescribed a muscle relaxant, which he took. However, when he woke up in the middle of the night and did not feel well, his mother took him to the hospital. He testified generally regarding his medical treatment, two surgeries to his back and physical therapy sessions.

A-1269-22

Joseph returned to school the following week and stated his grades were not affected by these events.

Joseph testified he was cleared to play baseball approximately a month after the surgeries and played on the freshman and JV baseball teams that season, missing only three or four games. However, he stated he "was very uncoordinated with any type of twisting, turning, or bending. Anything where [his] back was pretty much stretched out felt very unnatural." He felt his injury negatively impacted his hitting, running, fielding, and pitching.

After the season ended, Joseph began working out again to build up his strength to recover from his injuries and to prepare for the sophomore season. Joseph explained he did the same exercises as before his surgeries but used less than half the weight. He played on the JV team his sophomore year and in several varsity games.

Joseph again worked out at the gym during the summer prior to his junior year, although not as often as the previous summer. He made the varsity team his junior year. Although he tried out for the team his senior year, he later decided not to play. Joseph admitted he stated in his 2018 deposition testimony that he did not participate in sports as a senior "mostly because of work."

A-1269-22

Joseph testified he is self-conscious about the scars on his back from the surgery. He said he has trouble sleeping in certain beds. Joseph testified his pain fluctuates depending on the weather and the day. He said the pain is worse when he doesn't work out because he gets tight. He does not take any pain medication for his back.

During Daina's testimony, she explained Joseph started playing baseball in first or second grade and that he was very motivated. She said he wanted to play baseball in college, and he prepared for the baseball season by getting up at 5:00 a.m. "at least every other" morning to work out at the gym.

After the workout on February 17, 2016, Daina said Joseph came home and was exhausted and sore but did not report any other concerns. The next morning, he complained that his back was "on fire," and Daina stated he looked "a little pale."

Two days after the workout, on Friday, Joseph "looked a little ill" and "withdrawn." Daina thought he might have a cold or the flu, but he went to school so he could go to baseball tryouts. After Joseph called Daina to pick him up from school, she observed that "he was . . . walking very slow" and that "he looked very pale and almost . . . nauseous." She took him to the pediatrician, who examined his back and said Joseph might have pulled a muscle.

A-1269-22

Daina took Joseph home and testified he did not eat that evening, which was not normal, and he took some of the muscle relaxers the pediatrician had prescribed before falling asleep in the basement. At about 3:00 a.m., Joseph came up the stairs. Dania said he was moaning and "looked like he was going to collapse." She took him to the hospital.

Daina described the treatment given to Joseph—fluids—and the subsequent diagnoses of rhabdomyolysis and compartment syndrome and the need for surgery. She showed the jury pictures of Joseph in the hospital after his surgeries.

Daina reiterated Joseph's testimony about his baseball career in high school. She said Joseph decided not to play baseball his senior year because he was not as good as he used to be, and he was in pain.

Daina testified she bought Joseph a new bed that was more comfortable, and he experiences pain when he takes out the garbage cans. She also said he has to sit down after walking and stretches to make himself more comfortable.

Several baseball players testified regarding these events. Kyle McKeary said he used a twenty-five-pound dumbbell during the workout and Joseph used one that was "definitely more than" that. Joseph's cousin also testified. He said he was partners with Joseph during the workout and they used a thirty-five or

8

forty-pound weight. Joseph did not mention any back pain to him. A third student said he used a thirty- or thirty-five-pound weight for the workout and Joseph's dumbbell was ten to fifteen pounds heavier. All of the students said the workout was voluntary and there was no sign in sheet.

John J. LoCurto, Jr., M.D., testified at trial via a de bene esse deposition done in 2020. He was the associate director of trauma surgical critical care at Hackensack University Medical Center and treated Joseph in the pediatric intensive care unit. Dr. LoCurto diagnosed Joseph with traumatic rhabdomyolysis and consulted with an orthopedic surgeon and a neurosurgeon. Dr. LoCurto performed compartment release surgery on Joseph's back to release the pressure and take out any dead or necrotic muscle. He explained that the cause of the necrotic muscle tissue "was extreme muscle exercise . . . and muscle fatigue."

The doctors did not close up Joseph's back at the end of surgery because they wanted to monitor him to make sure they had removed all of the dead muscle. The initial surgery was done February 22, and doctors went back in on February 24, took out more dead muscle, and closed his back. Joseph was discharged on February 28. Dr. LoCurto opined that 25 to 30% of Joseph's paraspinal muscles were removed during the surgeries. He testified that Joseph

9

would never be "100[%] of what he was because there's stuff missing" from his back.

Plaintiffs also presented James W. Cahill, M.D., an orthopedic surgeon specializing in sports medicine. Dr. Cahill explained to the jury that the paraspinal muscles help individuals move in different directions and stabilize the spine. He stated when a person works out, their muscles break down and then rebuild.

Dr. Cahill further explained that exertional rhabdomyolysis occurs when a person trains so intensely that the muscles break down beyond a point where they can easily stabilize or recover. Dr. Cahill said the February 17 workout described by Joseph was "high[]intensity" and "an exercise to failure," because he was transitioning from rest to lifting sizable weight rapidly and doing as many reps as possible. Dr. Cahill did not think the workout was appropriate for a high school student who had "sat on the couch for the past whatever amount of months."

Dr. Cahill testified the connection between high-intensity exercise and rhabdomyolysis was "well[]established," and he had treated other patients with the condition. The doctor also described exertional compartment syndrome as when the muscles are damaged and swell so much in the casings around them

10

that they do not absorb any blood which shuts off the circulation and damages the nerves.

Dr. Cahill explained the initial treatment for rhabdomyolysis was intravenous hydration, which Joseph received. After Joseph began to retain fluid, doctors performed a fasciotomy, removing the dead tissue as described by Dr. LoCurto.

Dr. Cahill then described the results of his June 19, 2019 examination of Joseph. He said the scars from the surgery ranged from about six to ten inches and that he had thick scar tissue, which was not normal. He found Joseph's back movement was diminished and "compromised . . . particularly for his age." The mobility was impacted by the removal of muscle and the scar tissue. Dr. Cahill testified that the surgery impacted Joseph's ability to play baseball. He stated physical therapy and weightlifting would improve Joseph's back.

Dr. Cahill diagnosed Joseph with rhabdomyolysis, compartment syndrome of the right and left paraspinal muscles in the lumbar spine, and a decompressed fasciotomy. He opined that Joseph's "[r]habdomyolysis was caused by a high-intensity, low-recovery, exercise to failure-type of exercise regimen that resulted in damage to his muscle." He said that the loss of 25 to 30% of his paraspinal muscles and internal and external back scars were

11

permanent conditions. Cahill conceded the medical community did not know why some individuals developed rhabdomyolysis and some did not after high-intensity workouts.

Dr. Cahill testified that Joseph's limited mobility in his back stressed other areas of his spine and there was a risk other parts of his spinal column could become symptomatic over time. The decreased flexibility of Joseph's ligaments and muscles would also stress the set joints of his spine. Dr. Cahill stated Joseph's condition would accelerate the aging process and result in lumbar discs that might degrade earlier than normal.

Plaintiffs also presented James S. Weagley through his de bene esse deposition. The trial court qualified Weagley as an expert in the field of coaching, athletic training, and recreational safety. Weagley testified that the New Jersey State Interscholastic Athletic Association (NJSIAA) rules allowed players, who decided on their own and without input by the coaches, to hold a workout in the school gymnasium prior to the particular sport's season.

Weagley explained the higher weight, lower-intensity weight training Joseph did before the February 17, 2016 workout did not prepare him for the after-school workout. Weagley also stated that the exercises in the voluntary workout all stressed the paraspinal muscles.

A-1269-22

Weagley was concerned there was no pre-assessment to determine what weight Joseph should use for the workout. He also explained that if proper form was not followed in completing the exercises, and students were doing as many reps as possible, there would be more stress on the muscles.

In his review of the record, Weagley did not see any indication Ferrara had experience or was certified in strength training. Weagley opined the workout was not appropriate for the students because of the methodology of choosing weights, and the exercises did not have any "carryover value" to baseball.

Weagley conceded he did not personally speak with Joseph, Daina, or any of the students who were present at the workout. He testified he was aware from Ferrara's deposition that Ferrara participated in a CrossFit[3] program which included the particular exercises, and he then incorporated those exercises into this workout with the students. Wegley also said these exercises were functional exercises not invented by CrossFit.

---

[3] On its website, CrossFit is described as "a fitness program" that is "centered on training and nutrition" and includes workouts comprised "of constantly varied, high-intensity, functional movements." What is CrossFit?, CrossFit, https://www.crossfit.com/what-is-crossfit (last visited July 9, 2024).

B.

Marc Ferrara was defendant's first witness. In February 2016, he was a sixth-grade math teacher employed by defendant, and coached high school bowling, soccer, and the cross-country teams. As stated, he was also the assistant JV baseball coach. He had previously been a member of Maxability Sports, a gym, but was never employed by them or paid to promote the business or work out there.

Ferrara explained he considered CrossFit to be a methodology of exercising. He stated the February 2016 workout was not a CrossFit workout. He described the workout as consisting of three minutes where the students did twenty-five kettlebell swings, fifteen burpees, and then as many air squats as they could complete in the remaining time. They completed four rounds of the exercises and had one minute of rest between rounds. It was a pre-season workout for conditioning that "focuse[d] on . . . stability, midline strength, strengthening your core, [and] cardiovascular endurance."

Ferrara learned about the workout from Jason Cannici, who sometimes supervised the weight room after school and was the head baseball coach. He said fifteen to twenty students attended the workout which was voluntary, no attendance was taken, and there was no sign-in sheet. According to Ferrara, the

14

workout was open to anyone from the high school who wanted to participate, and it did not impact a student's chance of making the baseball team. He testified the weight room was always open after school for students to work out in. Ferrara stated he did not violate any rules in holding the workout because teams were allowed to meet as long as they did not use baseball equipment.

Ferrara described Joseph as "a big kid[] [and] muscular," and stated that "he was bigger than the average kids on the team." On the day of the workout, the captain of the team led a dynamic warmup, which Ferrara supervised, for about twelve minutes. The students then went from the small gym to the weight room where they discussed the workout and he "instructed . . . parameters of what we wanted the students to be working on."

Ferrara explained the three exercises were chosen after a discussion between the students and himself. The students worked in pairs, and while one partner completed the exercises, the other made sure they were doing the workout correctly, kept time, and cheered them on.

Ferrara learned of Joseph's injury from another school staff member approximately a week after the workout. Ferrara then informed the athletic director, who asked him to fill out an accident report. In addition to his accident

15

report, Ferrara stated he knew the workout was what he had described because he specifically recalled it and he was there supervising it.

Ferrara explained the students had time to practice with the weights and choose what they were comfortable using for the workout. Then Ferrara and other students demonstrated the specific exercises. He stated the students were instructed not to use a weight over thirty pounds so that they could complete the workout and to do as many squats as possible. He testified the available dumbbells ranged from 5 to 110 pounds, there were multiple dumbbells of certain weights, and probably more weights than were needed. Ferrara did not specifically recall what weight Joseph used but stated if he saw him using a forty or forty-five-pound dumbbell, he would have told him to choose a weight less than thirty pounds.

Ferrara also agreed that students were instructed if they could not complete any of the exercises, they could stop. The students were not told to work out as hard or as fast as possible. He also testified he did not tell the students "to get their butts here for the next workout" or words to that effect.

Ferrara stated he supervised the workout and walked around the room to monitor students as they completed the exercises. Coach Cannici was also present as he was supervising the weight room that afternoon.

16

Ferrara did not notice anything unusual about Joseph while he was working out and Joseph did not complain to him during or after the workout. When Ferrara saw Joseph on Friday for another pre-season workout, he noticed that he looked "fluish" after he returned from the bathroom after the warmup. Ferrara told him he did not look good and that he should go home. Joseph did not say anything to Ferrara about his back.

Ferrara did not believe the workout was intense. He said he had done the exercises himself before and considered them "fairly common."

Ferrara explained Joseph returned to the baseball team during his freshman year and that, other than a scrimmage or two, he played in every freshman baseball game and some additional JV games. When Ferrara coached him, Joseph did not complain about any back pain.

Ferrara stated Joseph played JV baseball his sophomore year and a few varsity games as a pinch runner. Ferrara saw Joseph working out several times after his injury in the weight room and stated he did pull ups, pushups with a twenty-five-pound plate on his back, and back squats.

Cannici next testified. In 2016, he was a special education teacher in the school district and the varsity baseball coach. He had since retired. On the day of the workout, Cannici was the weight room supervisor, which he explained

meant supervising students in the weight room after school to make sure they were doing the exercises safely and the weight room was organized and clean.

Cannici explained the day of the workout, he and Ferrara planned a dynamic warmup upstairs in the small gym, and then the workout in the weight room. He recalled twenty to twenty-five students attended the workout, and that he, Ferrara, and other students modeled the exercises. He recalled walking around facilitating the workout, and that he and Ferrara came up with the plan for the specific exercises.

He agreed the students completed the exercises as described by Ferrara. He also said the students took rests during the workout and drank water. Cannici said the workout began at approximately 3:30 p.m. and was over at about 4:10 p.m. The workout was voluntary and there was no attendance or sign-in sheet, or record of which students participated. The workout did not impact whether a student made the baseball team, and it was not limited to only students who wanted to play baseball because the gym was open to all students at the school. If students from other sports wanted to attend the workout, Cannici stated they would have been allowed to participate.

According to Cannici, students were allowed to attend workouts before March 1, as long as they did not use baseball equipment. Cannici stated the

18

students (usually the captains) scheduled the workouts, and he had informed Ferrara there was a workout that day. They were intended to be pre-conditioning workouts.

The students were told to choose a weight that was appropriate and there were about two sets of dumbbells for "the standard weights" of five, ten, fifteen, twenty, twenty-five, and thirty pounds. Cannici did not observe the weight Joseph used but said if he had seen him using a forty or forty-five-pound weight, he would have stopped him. Cannici further explained students were instructed to stop if they could not complete the exercises and were not told to work as hard or as fast as they could. He did not recall telling students to encourage other students to come to the next workout.

Cannici stated he did not observe anything unusual about Joseph and Joseph did not complain to him during or after the workout. Cannici explained Ferrara saw Joseph after the warmup for the Friday workout and Ferrara told him to go home because he was not feeling well.

Cannici was unfamiliar with rhabdomyolysis before he was informed Joseph was diagnosed with it. Cannici did not think the February 2016 workout was intense. He and other students had done the exercises before. Cannici testified Joseph was medically cleared to return to baseball that same year and

19

that he played on the freshman and JV teams. Cannici coached Joseph in his junior year and did not recall him complaining about his back or any physical limitations.

Alphonses Heraghty, MSE, CPSI,[4] was qualified as an expert in the NJSIAA Handbook. He explained the NJSIAA oversees high school sports in New Jersey and provides rules and regulations for high school athletic programs.

In preparing his report, Heraghty stated he reviewed the 2018-2019[5] handbook and did not find that defendant violated any rule. He explained off-season weightlifting was allowed if it was not limited to only student athletes. He stated the February 2016 workout complied with the policy because attendance was not taken, there was no sign-in sheet, and no indication the workout was only for baseball players. He also stated Article 2 of the handbook allowed coaches to supervise open gym programs when athletes are not involved in their specific sport during the off-season. Heraghty noted there was no testimony that any baseball equipment was used during the workout.

---

[4] Heraghty's professional titles included holding a Master of Science in Physical Education and being a Certified Playground Safety Inspector.

[5] Heraghty said he used the 2018-2019 handbook because Weagley used it, and it was the one provided by defense counsel.

Ariz Mehta, M.D., was qualified as an expert in physical medicine and rehabilitation, pain medicine, sports medicine, and orthopedics. He examined Joseph in June 2019 and reviewed his medical records. During the examination, Joseph described the pain in his lower back as a six out of ten. He described his back "as tight and sore" and that the pain was worse when he woke up in the morning. Joseph told Dr. Mehta he did an exercise program in the morning and that his back difficulties were aggravated by going up and down stairs. He took over-the-counter pain medication if needed.

During Dr. Mehta's physical examination, he found some spasm in Joseph's back muscles and that he had a limited range of motion of his back, most significantly when he was bending backwards or extending. He concluded Joseph "had no functional limitations with regards to his activities of daily living or independent activities . . . . [Joseph]'s physical examination show[ed] no strength abnormalities and the range of motion was functional." He concluded Joseph could participate in sporting activities. He also stated Joseph could experience issues in his lumbar area as he aged.

Marc Allen Rabinoff, M.D., was qualified as an expert in sports administration, liability, sports and recreation training, standards of care in the weight room setting on the high school and collegiate level, sports risk

21

management and liability, and human performance and sport. After summarizing the facts of the case and testimony from various individuals, Dr. Rabinoff explained the exercises Joseph completed during the workout were not CrossFit-inspired because they were "normal exercises that you would see anywhere." He stated CrossFit did not invent any of the exercises and that it was only a brand name.

Dr. Rabinoff stated each exercise was appropriate for an individual intending to join a baseball team to complete. Burpees were helpful for general conditioning and shoulders, and upper body strength was important in baseball. Air squats were important for catchers and for bending over to pick up baseballs and throwing. Kettlebell swings helped with weight resistance and was a "whole body" workout beneficial for conditioning.

Dr. Rabinoff stated Weagley made assumptions and conclusions in his report that were not based in fact. There were no references to industry standards or reference materials, but instead Weagley stated his conclusions were based on his experience. Dr. Rabinoff also disagreed with Weagley's opinion that the exercises were inappropriate for the situation.

Dr. Rabinoff further testified that, in addition to being caused by trauma, exertional rhabdomyolysis can develop over time and was not something that

Joseph sustained from the twelve-minute workout. Instead, he explained it was "critical to look at what a person who [was] diagnosed with [e]xertional [r]habdomyolysis . . . d[id] leading up to it." Dr. Rabinoff stated Joseph was at the gym for seventeen days doing "hardcore workouts, with no cardio and maybe no drinking." But Weagley had not considered that testimony.

Rabinoff stated he had experience writing about exertional rhabdomyolysis and some experience treating students who were dehydrated. In his opinion, defendant had appropriately supervised the weight room because Ferrara and Cannici, who had weight training experience, oversaw it and "followed all kinds of standards." He explained they made sure they were in the weight room, demonstrated the exercises, and allowed students to use lighter weights if they chose. The workout was properly timed because it was for conditioning.

Defendant also presented Joshua Schwimmer, M.D., qualified as an expert in nephrology and general internal medicine. He explained rhabdomyolysis is the breakdown of skeletal muscle and compartment syndrome occurs when the damaged muscles swell so much they expand into the fascia.

Dr. Schwimmer testified that Joseph's exertional rhabdomyolysis was unforeseeable because Joseph: was athletic; routinely lifted weights for three or

four hours three to five times a week; routinely exercised his paraspinal muscles; the workout only lasted twelve minutes; no other student at the workout developed exertional rhabdomyolysis; he had no risk factors for developing rhabdomyolysis; and it was rare for the exercises he completed to cause rhabdomyolysis, especially without any risk factors. Risk factors for rhabdomyolysis included: having sickle cell disease, genetic risk factors, being dehydrated, exercising on a hot day, and having underdeveloped muscles.

Dr. Schwimmer explained exertional rhabdomyolysis usually occurred within one or several days to people who were not used to working out and undertook intense exercise. Although Joseph did not fit that mold, Dr. Schwimmer opined his condition was caused by the February 2016 workout.

Dr. Schwimmer stated exertional paraspinal rhabdomyolysis with compartment syndrome caused by these kinds of exercises was "extremely rare" and he had not personally seen it in his nineteen years of practicing medicine. His impression was that, considering Joseph's condition before the February 2016 workout, this was a "very rare occurrence." He found very few similar cases in his review of medical literature and most of the relevant peer reviewed papers included individuals who exhibited risk factors.

A-1269-22

Dr. Schwimmer conceded exertional rhabdomyolysis could occur in trained individuals that greatly increased their workouts, worked different muscle groups or used different contraction types, or were encouraged to overexert themselves. However, he reiterated that Joseph's diagnosis of the condition could not have been reasonably anticipated or foreseen.

C.

Following the close of the evidence, the court gave the parties a draft of the proposed jury charges. The parties agreed to the jury charges and the proposed verdict sheet.

Pertinent to this appeal, the court charged the jury with the following instructions:

> In determining whether reasonable care has been exercised, you will consider whether the [d]efendant ought to have foreseen, under the attending circumstances, that the natural and probable consequence of [d]efendant's act or omission to act would have been some injury. It is not necessary that the [d]efendant have anticipated the very occurrence which resulted from [d]efendant's wrongdoing[,] but it is sufficient that it was within the realm of foreseeability that some harm might occur thereby.
>
> The test is the probable and the foreseeable consequences that may reasonably be anticipated from the performance[,] or the failure to perform[,] a particular act. If an ordinary person[,] under similar circumstances and by the use of ordinary care[,] could

25

have foreseen the result, by way of example, that some injury or damage would probably result and either would not have acted or[,] if the ordinary person did act, would have taken precaution to avoid the result. Then the performance of the act or the failure to take such precautions would constitute negligence.
[See Model Jury Charges (Civil), 5.10B, "Foreseeability (As Affecting Negligence)" (rev. Oct. 2022).]

The court also charged the jury with Model Jury Charge (Civil), 7.11(A), "Care Required of Children" (approved May 1991):

A child[,] old enough to be capable of negligence[,] is required to act with the same amount of care as children of similar age, judgment[,] and experience. In order for you to determine whether a child has acted negligently, you should take into consideration the child's age, intelligence[,] and experience.

Also, you must consider the child's capacity to understand and avoid the danger to which [the child] was exposed in the actual circumstances and situation in this case. You[,] the jury[,] must decide the factual question of whether this child was comparatively negligent.

The court further charged the jury with Model Jury Charge (Civil), 7.31, "Comparative Negligence/Fault: Ultimate Outcome" (rev. Nov. 2023):

If you find that the [p]laintiff, Joseph Ronne, and [d]efendant, Dumont Board of Education, were negligent or at fault and proximately caused the accident or injury, then you must compare the negligent conduct or fault of that individual or entity in terms of

26

percentages. You will attribute to each of them that percentage that you find describes or measures [the individual's or entity's] negligent contribution or fault in proximately causing the accident or injury.

The percentages must add up to 100[%]. You should not allocate any percentage to any individual or entity who you have found was not both negligent, at fault[,] and a proximate cause of the accident or injury. I will explain to you the effect of these percentages.

In order for the [p]laintiff to recover against [d]efendant, [p]laintiff's percentage of fault must be 50[%] or less. If the [p]laintiff['s] percentage is more than 50[%], [the plaintiff] will not recover damages at all and your deliberations are concluded[,] and you should not make any determination as to damages. A plaintiff whose percentage is 50[%] or less will recover from any defendant whose fault you have found was a proximate cause of the accident or injury . . . .

D.

Following deliberations that spanned over two days, the jury returned a verdict finding both Joseph and defendant were negligent, and their negligence was the proximate cause of Joseph's injury. They attributed 40% of the total negligence to defendant and 60% to Joseph. On September 30, 2022, the court entered judgment of no cause of action in favor of defendant.

Thereafter, plaintiffs moved under Rule 4:49-2 for reconsideration to alter or amend the judgment in their favor and schedule a trial for damages, or alternatively for a new trial. Plaintiffs asserted there was evidence to support a

27

finding of defendant's negligence, but there was no evidence that Joseph was at fault for his injuries or knew they were foreseeable.

In a lengthy, thoughtful oral decision, the court noted the parties agreed on the model civil jury charge regarding foreseeability. After summarizing the proofs presented at trial and the parties' arguments on the motion, the court found it was required to enter judgment consistent with the jury's verdict. In addition, plaintiffs had not presented a specific basis for the motion, or a statement of the matters or caselaw the court overlooked. Therefore, the court denied the motion for reconsideration.

The court then considered the motion for new trial, noting Rule 4:49-1(a) required a consideration of tangible and credibility factors and the overall feel of the case to examine if the jury's verdict was erroneous. After citing to the applicable caselaw, the court reiterated both parties "fully participated in the drafting and ratification of the jury charges and verdict sheet." Plaintiffs did not object to the charge or verdict sheet at any time.

The court rejected plaintiffs' argument there was no evidence to find Joseph was negligent. The court found Joseph exerted himself in the workout to impress his coaches, chose a heavier weight than the other students, did not stop to take a break during the workout, despite acknowledging he knew he

could, and did not hydrate on breaks. Although he was in "terrible" and "severe" pain," Joseph chose to attend the second workout instead of seeking medical attention. Therefore, the court concluded that "to suggest there is no evidence in the record to support the jury's finding of comparative negligence and the allocation of [sixty percent] fault is patently incorrect."

As to foreseeability, the court noted the parties "heavily disputed" the risk and foreseeability of developing exertional rhabdomyolysis from the February 17 workout. Dr. Rabinoff testified about the "appropriateness" of the chosen exercises and supervision of the workout, and Dr. Schwimmer explained how rare the condition was. In contrast, plaintiffs produced evidence that the exercises were high-intensity and not appropriate for high school students.

The court stated it was the jury's province to weigh the witnesses' testimony and credibility. The court noted the jury requested a copy of the negligence instructions and deliberated for a number of hours.

The jury was charged with assessing Joseph's capacity to know and avoid danger, specifically the actual danger in this case the risks from over-exertion. The court stated defendant was not required to establish Joseph knew or should have known he would suffer specifically from exertional rhabdomyolysis as a result of the workout. The court reiterated the test of foreseeability was "the

29

probable and foreseeable consequences that may[ be] reasonably anticipated from the performance or the failure to perform a particular act."

The court further found there was no evidence confirming defendant and its coaches knew the workout could lead to rhabdomyolysis. The court concluded the verdict was "manifestly reasonable and . . . amply supported by the evidence in the record." The court stated: "The evidence adduced at trial revealed that [Joseph] over-exerted himself during the course of the workout using weight and other exercises in rapid succession with breaks, that ultimately led to his compartment syndrome and [r]habdomyolysis, which is a rare condition." The court denied the motion for a new trial in a December 22, 2022 order.

## II.

On appeal, plaintiffs contend the court erred in denying their motion for a new trial by misapprehending the concepts of risk and foreseeability. We disagree.

Pursuant to Rule 4:49-1(a), a new trial should be granted if, after having accorded deference to the jury's ability to evaluate the credibility of witnesses, the court "clearly and convincingly" finds "there was a miscarriage of justice." On review, the "court should give considerable deference to a trial court's

decision" because it "has gained a 'feel of the case' through the long days of the trial." <u>Lanzet ex rel. Ests. of Lanzet v. Greenberg</u>, 126 N.J. 168, 175 (1991).

Plaintiffs assert they are not challenging the substance of the jury charge or the verdict sheet. Instead, they contend there was no evidence to support the jury's finding that Joseph was negligent. Plaintiffs contend Joseph assumed the reasonable risks of an intense workout, like thirst, muscle fatigue, nausea, and weakness. However, Joseph did not know the workout could result in exertional rhabdomyolysis. Since there was no proof that Joseph could have foreseen the risk of developing rhabdomyolysis, plaintiffs contend the jury could not find he was negligent. Therefore, the court erred in not vacating the comparative negligence verdict and remanding for a trial on damages.

Plaintiffs' reliance on <u>Rule</u> 4:49-2 for relief is misguided. The <u>Rule</u> only applies to the reconsideration of a judgment or final order. Although plaintiffs technically requested the court reconsider the entry of judgment, they were actually asking the court to overturn the jury's verdict. That is a motion for a new trial governed by <u>Rule</u> 4:49-1. The court cannot alter the jury's verdict. It entered judgment as required under <u>Rule</u> 4:47(a).

We turn then to the court's decision denying plaintiffs a new trial and begin with a consideration of the general principles of negligence and foreseeability.

Negligence is the "failure to exercise, in the given circumstances, that degree of care for the safety of others, which a person of ordinary prudence would exercise under similar circumstances." Maison v. N.J. Transit Corp., 245 N.J. 270, 313-14 (2021) (Patterson, J., concurring in part and dissenting in part) (quoting Model Jury Charges (Civil), 5.10A, "Negligence and Ordinary Care—General" (rev. May 2009)).  The court instructed the jury how it should determine whether Joseph and defendant exercised reasonable care in their actions surrounding the workout.  The jury was told to

> consider whether [the parties] ought to have foreseen, under the attending circumstances, that the natural and probable consequence of [their] act or omission to act would have been some injury.  It is not necessary that the [parties] have anticipated the very occurrence which resulted from [their] wrongdoing but it is sufficient that it was within the realm of foreseeability that some harm might occur . . . .

> [See Model Jury Charges (Civil), 5.10B.]

Plaintiffs' argument that Joseph could not be negligent because he did not know about the increased and unreasonable risk of developing rhabdomyolysis is unsupported by caselaw.  Joseph did not have to understand there was an

unreasonable risk of being injured. For a jury to find him negligent, it only needed to conclude that Joseph could have foreseen that overexerting himself in a workout could result in a risk of harm or injury. See Koenig v. Gen. Foods Corp., 168 N.J. Super. 368, 372-73 (App. Div. 1979).

As our Court has stated, "An act is foreseeable when a reasonably prudent, similarly situated person would anticipate a risk that [their] conduct would cause injury or harm to another person. So long as the injury or harm suffered was within the realm of reasonable contemplation, the injury or harm is foreseeable." Komlodi ex rel. Komlodi v. Picciano, 217 N.J. 387, 417-18 (2014) (citation omitted). However, the precise injury does not need to be foreseen, instead there must only be conduct that "creates an unreasonable risk of foreseeable harm." Koenig, 168 N.J. Super. at 373.

The jury heard evidence that Joseph chose a forty-pound dumbbell for the workout, did not drink water, and did not stop even when tired. Joseph testified he believed he was stronger than many of the other students and he wanted to impress the coaches. As the trial court found, there was ample proof for the jury to conclude Joseph was negligent in his conduct during the workout which was the proximate cause of his injury and resulting damages. Plaintiffs have not

demonstrated a "miscarriage of justice" entitling them to a new trial.  See R.
4:49-1(a).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office

CLERK OF THE APPELLATE DIVISION

A-1269-22